PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1088
_____

IN RE: PROCESSED EGG PRODUCTS ANTITRUST
LITIGATION

T.K. RIBBINGS FAMILY RESTAURANT, LLC;
JOHN A. LISCIANDRO, DBA Lisciandro's Restaurant
EBY-BROWN COMPANY LLC; KARETAS
FOODS INC.,

Appellants
_____

No. 19-1188
_____

IN RE: PROCESSED EGG PRODUCTS ANTITRUST
LITIGATION

Rose Acre Farms, Inc,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-08-md-02002)
District Judge:  Hon. Gene E.K. Pratter

_____

Argued
March 25, 2020


Before:   JORDAN, RESTREPO, and FUENTES, *Circuit
Judges.*

(Filed: June 22, 2020)
_____

Ronald J. Aranoff, Esq.
Wollmuth Maher & Deutsch
500 Fifth Avenue
12th Floor
New York, NY 10110

Stanley D. Bernstein, Esq.
Bernstein Liebhard
10 East 40th Street
22nd Floor
New York, NY 1001

Michael D. Hausfeld, Esq.
Hausfeld
1700 K Street, N.W.
Suite 650
Washington, DC 20006

Stephen R. Neuwirth, Esq.
Kathleen M. Sullivan, Esq.   [ARGUED]
Quinn Emanuel Urquhart & Sullivan
51 Madison Avenue
22nd Floor
New York, NY 10010

Mindee J. Reuben, Esq.
Lite DePalma Greenberg
1835 Market Street
Suite 2700
Philadelphia, PA 19103

Stephen D. Susman, Esq.
Susman Godfrey
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
        *Counsel for Appellants T.K. Ribbings Family
Restaurant, LLC;*
        *John A. Lisciandro, DBA Lisciandro's Restaurant;*
        *Eby-Brown Company LLC; Karetas Foods Inc.*

Donald M. Barnes, Esq.
Jay L. Levine, Esq.   [ARGUED]
Porter Wright Morris & Arthur
2020 K Street, N.W.
Suite 600
Washington, DC 20006

James A. King, Esq.
Porter Wright Morris & Arthur
41 South High Street
Suite 2900
Columbus, OH 43215

Leah A. Mintz, Esq.
Robert M. Palumbos, Esq.
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA 19103
        *Counsel for Appellee Rose Acre Farms, Inc.*

Michael A. Lindsay
Dorsey & Whitney
50 South Sixth Street – Ste. 1500
Minneapolis, MN  55402
        *Counsel for Amicus National Council of Farmer Cooperatives*

_____

OPINION OF THE COURT
_____


JORDAN, *Circuit Judge*.

In this antitrust class action brought by egg purchasers,[1] the plaintiffs claim that egg producers conspired to inflate

---

[1] Claims were also brought by the purchasers of egg products, but those claims are not now at issue.

4

prices through three stratagems: (1) early slaughtering of hens and similar supply-reducing steps; (2) creation of an animal-welfare program that was actually designed to reduce the egg supply; and (3) coordinated exports of eggs. Before the District Court, the plaintiffs argued that all three of those contrivances were part of a single overarching conspiracy that was anticompetitive *per se* and therefore unlawful under the Sherman Act, 15 U.S.C. § 1 et seq. The defendants countered that the District Court should look at each alleged stratagem of the conspiracy separately and determine whether to apply the *per se* standard for antitrust liability or, instead, the more commonly applied rule of reason. In summary judgment briefing, the parties focused on one of the three alleged stratagems, and the District Court decided to evaluate it under the rule of reason. The case then proceeded to trial with all three stratagems being evaluated under that standard. Following the jury's verdict, the District Court entered judgment for the defendants.

The plaintiffs' primary argument on appeal is that, contrary to the District Court's approach, the alleged conspiracy should have been evaluated under the standard of *per se* illegality rather than the rule of reason. We conclude that the District Court was right and, accordingly, will affirm.

## I. BACKGROUND

The plaintiffs represent a class of "[a]ll individuals and entities that purchased shell eggs produced from caged birds in the United States directly from Defendants during the Class Period from September 24, 2004 through December 31,

5

2008."[2]  (J.A. 125.)  Defendant Rose Acre Farms, Inc. ("Rose Acre"), the only defendant left in the case,[3] sells shell eggs and egg products for the food service industry.  Rose Acre is a member of both the United Egg Producers ("UEP") and the United States Egg Marketers ("USEM"), which are trade groups representing egg producers.

As noted, the plaintiffs allege that Rose Acre participated in a conspiracy to reduce the supply of eggs by a variety of means.  First, they say that, during the class period, UEP told its members to follow short-term supply-reducing recommendations, including slaughtering hens earlier than had previously been done, causing hens to molt early,[4] and reducing the hatching of chickens.  The plaintiffs argue that

---

[2] The plaintiffs representing the class are: T.K. Ribbing's Family Restaurant, LLC, a restaurant in Falconer, New York; John A. Lisciandro d/b/a Lisciandro's Restaurant, a restaurant in Jamestown, New York; Eby-Brown Company LLC, a convenience store supplier and wholesale food distributor based in Naperville, Illinois; and Karetas Foods Inc., a Reading, Pennsylvania-based food distributor to institutions, restaurants, and retailers.

[3] The plaintiffs originally sued several other defendants with whom they have since settled.  Rose Acre and two other defendants went to trial.  The plaintiffs only appeal the verdict as to Rose Acre.

[4] "Molting is the process whereby hens lose their feathers and regrow them—hens lay no eggs when molting." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 130 n.2 (E.D. Pa. 2015) ("*Processed Egg Prods. I*").

6

those recommendations were explicit production restrictions, the purpose of which was to reduce the supply of eggs. Rose Acre does not explain why UEP made those recommendations but does emphasize that they were nothing more than recommendations. And, according to Rose Acre, it is unclear whether the suggested practices actually did reduce the supply of eggs. For example, Rose Acre contends that early molting of a hen would temporarily halt the hen's egg production for a few weeks but should thereafter have increased egg production and the life span of the hen.

Second, the plaintiffs allege that a UEP certification program ("the Certification Program" or "the Program") that was promoted as a set of measures for animal welfare was actually intended to reduce the supply of eggs. The Program required egg producers to put fewer chickens in each cage to give the chickens more space. It also prohibited producers from backfilling, that is, replacing caged hens that had died. Under the Program, eggs would be labeled as "UEP Certified" only if 100% of a producer's eggs were produced in compliance with the Program's rules. In response to the charge that the Certification Program was designed to drive down supply and so drive up prices, Rose Acre says that the Program was developed by animal welfare scientists for humane purposes and that it did not limit the production of eggs. Rose Acre emphasizes that the Program's guidelines did not limit the number of hens a producer could own, the number of hen houses a producer could use, or the number of eggs a producer could sell. Additionally, Rose Acre asserts that the prohibition on backfilling did not necessarily reduce the supply of eggs because it tends to prevent disease, social competition, and stress within a flock – all of which lead to increased mortality and decreased egg production.

7

Third, the plaintiffs contend that UEP conspired with its members, through USEM, to collectively export eggs at below-market prices in order to inflate domestic egg prices. Rose Acre responds that the eggs it exported were surplus eggs not ordered by regular customers, and that any price effects were transitory because the exports represented such a small proportion of the eggs produced.

The plaintiffs' appeal centers on the standard for evaluating the lawfulness of actions taken by Rose Acre and its co-defendants. As more fully described herein, restraints on trade are typically judged under what is called the "rule of reason," which basically asks whether, in light of all the circumstances in a case, the restraint in question is an unreasonable burden on competition. *See infra* pp. 13-14. Some restraints, however, are so manifestly anticompetitive that they do not require extensive analysis and are treated as illegal *per se*. Whether to apply the rule of reason or the *per se* standard has been one of the hotly-contested issues throughout this case.

It first arose, though, in companion cases when certain defendants filed a motion for summary judgment. A separate set of plaintiffs – the so-called Direct Action Plaintiffs or "DAPs" – had decided to file their own antitrust suits rather than participate in this class action. Their cases were then consolidated with this one for pre-trial proceedings. In litigating a summary judgment motion in the DAP cases, the defendants attacked the allegations related to the Certification Program, contending that the Program could not possibly constitute a *per se* violation of the Sherman Act. They argued that "[t]he Program and its components are not a naked

restriction on supply, they produce at least plausible procompetitive benefits, and they make up a quality standard, which itself provides procompetitive benefits to consumers and producers." (J.A. 2172-73.) Although that motion for summary judgment was filed in the DAP cases, not this one, the District Court permitted the representative plaintiffs here to file briefing to argue that the *per se* rule should apply, since the same issue was in play in this case. In their brief, the plaintiffs said that the *per se* rule ought to apply because the defendants engaged in a horizontal conspiracy to reduce the supply of eggs in order to raise prices. The plaintiffs also argued that the alleged conspiracy had to be looked at as a whole, so it was inappropriate to consider the different contrivances of the conspiracy separately.

The District Court decided that each individual component of the alleged conspiracy could be considered separately and that the rule of reason should apply to the Certification Program, the only component on which the Court was asked to rule. The Court emphasized that the rule of reason is the usual standard for judging allegedly anticompetitive actions, and it explained that "[a]llowing the plaintiffs' characterization of the defendant's conduct as comprising a single conspiracy as dispositive for purposes of application of *per se* or rule of reason analysis would completely subsume the rule of reason in most, if not all circumstances." *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1040 (E.D. Pa. 2016) ("*Processed Egg Prods. II*").

In rejecting the *per se* standard, the Court said that the "UEP Certifi[cation] Program does not involve an express agreement among competitors to restrain supply and … the

9

record contains evidence indicating that the certifi[cation] program provided certain procompetitive benefits." *Id.* at 1045. The Court indicated that the plaintiffs, despite their allegations, had not provided any evidence that the Program was an effort to hike prices by restricting the supply of eggs. Accepting several defense arguments, the Court declared that there were some plausible procompetitive benefits to the Program, including that increased cage space, although limiting the number of hens, could increase the hens' productivity because they would be healthier and less stressed, and that the prohibition on backfilling could reduce disease and lead to the production of more eggs. The Court also observed that the Program did not limit the number of hens a producer could own or the number of eggs a producer could produce. Finally, the Court noted that the supply of eggs went up during the class period, and thus the plaintiffs would need to present some econometric analysis to explain their contention that the national egg supply would have increased more rapidly but for the defendants' conduct. In light of all that, the District Court concluded that the rule of reason, not the *per se* standard, should apply to the Certification Program.

When it came time to try the present case, neither side contested the decision that the rule of reason would be used to judge the Program, and neither filed a pre-trial motion asking the Court to rule on the standard to be applied to the other components of the alleged conspiracy.[5] Instead, before trial

---

[5] A few months before trial in this case, the plaintiffs filed a motion that they styled as a "Motion to Confirm" that the *per se* rule would apply to the claim of an overarching conspiracy to reduce supply. In that motion, they said simply that it would be unfair to apply the rule of reason in this case

and in response to the Court's inquiry about whether the plaintiffs would ask the jury to find three conspiracies or one overarching conspiracy, the plaintiffs said that they were

> prepared to try the case under the Rule of Reason on the single question of whether there was a single conspiracy to reduce the supply of eggs and thereby raise prices. So that it would be just a one-question case, whether there was a single conspiracy. Plaintiffs would preserve their right to appeal the Court's earlier determinations on the Rule of Reason[.]

(J.A. 1283-84.) The plaintiffs filed proposed jury instructions based on the rule of reason standard. Their proposed verdict form required the jury to determine whether "the conspiracy unreasonably restrained trade[.]" (J.A. 756.)

---

because they had alleged from the beginning that the defendants had engaged in a single conspiracy to reduce the supply of eggs, and that, by not filing a motion for summary judgment, the defendants had forfeited their chance to argue that the rule of reason should apply. The District Court denied the plaintiffs' motion. It rejected the forfeiture argument and also saw no reason to deviate from its prior determination in the DAP cases that the rule of reason applies in assessing the UEP Certification Program. The Court did not rule on whether the rule of reason or the *per se* rule should apply to the components besides the Certification Program but rather requested that the parties file separate motions on what standard should apply to those other components, if the parties wanted a ruling. No party submitted any such motion.

After a five-week trial, the District Court told the jury, among other things, that, in order to rule for the plaintiffs, it had to find, "[f]irst, the existence of a contract, combination, or a conspiracy between or among at least two separate entities[, and s]econd, that the contract, combination, or conspiracy unreasonably restrains trade." (J.A. 1021.) The Court asked whether the parties had any objection to the instructions, and no one objected. The verdict form asked:

> 1. Do you find, by a preponderance of the evidence, that there was a single overarching conspiracy to reduce supply comprised of all three of (1) short term supply recommendations, (2) the United Egg Producers (UEP) Certifi[cation] Program, and (3) United States Egg Marketers (USEM) exports?
>
> 2. Do you find, by a preponderance of the evidence, that [the defendants] participated in the conspiracy to reduce supply?
>
> 3. Do you find, by a preponderance of the evidence, that the conspiracy imposed an unreasonable restraint on supply?

(J.A. 760.) The jury answered: "Yes" to question 1 and "Yes" as to Rose Acre for question 2. It answered "No" to question 3. Because it found that the conspiracy did not unreasonably restrain supply, the jury did not reach the issue of injury. No one objected to the verdict or otherwise voiced concern about the consistency of the jury's answers, and the District Court entered judgment for the defendants.

12

The plaintiffs later filed a motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment. They argued that the jury's finding of the existence of an overarching conspiracy to reduce supply was "new evidence" and that it mandated the application of the *per se* rule and entry of judgment for them. The Court was unpersuaded. It rejected the notion that the jury's verdict constituted evidence. And it again rejected the plaintiffs' argument that the *per se* standard should apply, stating that "the Court's legal analysis does not have to conform to the subsequent jury's verdict; the jury's verdict is instead an outgrowth of the Court's legal rulings because those rulings create the universe in which the jury makes its decisions." *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2018 WL 6592990, at *4 (E.D. Pa. Dec. 14, 2018) ("*Processed Egg Prods. III*"). The Court also noted that the plaintiffs "opted to try the case under the rule of reason as one overarching conspiracy[,]" after the ruling on the applicability of the rule of reason, and that the jury's verdict was "entirely consistent with the rule of reason." *Id.*

This appeal followed.[6]

---

[6] Rose Acre cross-appealed, with its appeal being expressly contingent on a decision to vacate the judgment in its favor. Because we will affirm, we need not address the cross-appeal.

13

## II. DISCUSSION[7]

The plaintiffs' fundamental position is that the District Court erred in determining the rule of reason, rather than the *per se* standard, should guide the antitrust analysis in this case. They argue, first, that the Court should not have looked at the components of the alleged conspiracy separately, but rather was required to look at the defendants' actions as a single, overarching conspiracy, as the plaintiffs alleged. They next argue that, because the alleged conspiracy was a horizontal combination to reduce supply and raise prices, the *per se* standard applied. Finally, they say that, even if the District Court did not err in determining before trial that the rule of reason was the correct standard, the jury's finding that Rose Acre participated in a single, overarching conspiracy to reduce the supply of eggs mandates application of the *per se* rule and judgment in their favor. We will address each of those three

---

[7] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. "The selection of a mode of antitrust analysis is a question of law over which we exercise plenary review." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 829 n.7 (3d Cir. 2010). "We review a District Court's denial of a Rule 59(e) motion for relief from judgment for abuse of discretion (except for questions of law, which are subject to plenary review)." *United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 248 (3d Cir. 2016).

arguments in turn, all of which are flawed in one way or another.[8]

Before that, however, we highlight the distinction between the two modes of analysis at issue, the rule of reason and the *per se* standard of liability. Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States[.]" 15 U.S.C. § 1. The Supreme Court "has never taken a literal approach to [§ 1's] language. Rather the Court has repeated time and again that § 1 outlaw[s] only *unreasonable* restraints." *Leegin Creative Leather Prods., Inc., v. PSKS, Inc.*, 551 U.S. 877, 884 (2007) (citations and internal quotation marks omitted) (emphasis added). The general analytical approach, then, is to evaluate alleged violations of § 1 under the rule of reason. *Id.* That rule

---

[8] Rose Acre argues that the plaintiffs failed to preserve their argument that the *per se* standard applies to the alleged conspiracy. Not so. The plaintiffs' briefing in response to the motion for summary judgment in the DAP cases – cases consolidated for a time with this one – preserved the issue. The District Court expressly allowed the plaintiffs to file a brief in which they made the same arguments that they make here: that the *per se* standard applies to the alleged conspiracy and that the court must look at the conspiracy as a whole. The plaintiffs also made abundantly clear in numerous filings in this case that they believed the defendants' practices were part of one overarching conspiracy that was subject to the *per se* standard. There is no fair basis for finding forfeiture of that argument. *See Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) (explaining the criteria for a finding of forfeiture of an argument).

tells "the factfinder [to] weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* at 885. Circumstances to consider include information about the business, the restraint's history and effect, and the business's market power. *Id.* at 885-86.

Although the rule of reason is the default mode of analysis, some practices so clearly violate § 1 that they are deemed unreasonable *per se*. "Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices[.]" *Id.* at 886. "To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects and lack any redeeming virtue." *Id.* (citations, internal quotation marks, and alteration omitted). Courts have "expressed reluctance to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *Id.* at 887. Rather, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason[.]" *Id.* at 886-87 (citations and internal quotation marks omitted).

### A. Evaluating the Separate Components of the Conspiracy

With that in mind, we consider first whether the District Court erred in looking at each of the individual components of the conspiracy separately. In arguing that there was error, the plaintiffs rely on *Continental Ore Co. v. Union Carbide & Carbon Corp.*, in which the Supreme Court criticized the court

of appeals because it had "approached Continental's claims as if they were five completely separate and unrelated lawsuits," rather than all parts of the "basic plan to monopolize the … market[.]'" 370 U.S. 690, 698 (1962). But, as the District Court correctly concluded here, *Continental Ore* does not require analysis of the distinct components of a conspiracy as if they were an undifferentiated and indistinguishable bunch of behaviors.

The Supreme Court's admonition against "compartmentalizing … various factual components" was given in relation to a lower court's assessment of the sufficiency of evidence at a trial, and the direction given was definitely not that the various stratagems of an alleged conspiracy must be evaluated under a single standard. *Id.* at 699. Quite the contrary. As our late colleague Judge Edward R. Becker (then serving as a District Court Judge) cogently explained:

> In *Continental Ore* itself, the Supreme Court engaged in a detailed analysis of the record with respect to three of the four ventures which the Court of Appeals had addressed on their facts, concluding with respect to each of the three considered separately that there was enough evidence of causation to preclude a directed verdict. If the warning against "compartmentalizing" an antitrust conspiracy case were meant to prevent a court from breaking down a plaintiff's allegation of a "unitary" conspiracy into its component parts for purposes of analysis, the Court would not have engaged in

17

the "forbidden" analysis in the very same opinion in which it issued the warning.

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 513 F. Supp. 1100, 1167-68 (E.D. Pa. 1981) (Becker, J.) (citation omitted).

The plaintiffs in the present case nevertheless contend that, because they alleged the defendants engaged in a single, overarching conspiracy, all of the defendants' conduct must be evaluated under a single standard and, given their allegations, it must be the *per se* standard. The plaintiffs evidently believe that, because they are masters of their complaint, they are also masters of the District Court in deciding the analytical approach to be taken in the case. Their power to dictate analysis and outcome is not what they wish it were.

When determining what standard to apply, courts are required to look at the "economic effect rather than [rely] upon formalistic line drawing." *Leegin*, 551 U.S. at 887. The plaintiffs' characterization of the defendants' conduct – whether as a single overarching conspiracy or as three separate conspiracies – does not determine how a court is to assess differing actions that the defendants are accused of taking. When different stratagems are alleged to have furthered an antitrust conspiracy, the court is free to determine which analytical standard should apply to each. It is possible that different aspects of an alleged conspiracy can have very different economic consequences, and that, accordingly, different standards should apply when assessing whether each has an unlawful anticompetitive effect. *Cf. id.* at 893 (applying different analytical standards to different parts of an alleged conspiracy, where one part of the alleged conspiracy was

18

horizontal and one was vertical). Were it otherwise, the rule of reason, which is supposed to be the widely applicable standard, could be relegated to the margins. A plaintiff with a bucket full of allegations about behavior rightly subject to the rule of reason could easily, by adding a single allegation of behavior that is anticompetitive *per se*, demand *per se* analysis of the whole.

The District Court did not err in rejecting that kind of approach. Courts can consider the differing components of an alleged conspiracy separately when determining which mode of antitrust analysis to apply.

## B.    The Certification Program

Turning to the UEP Certification Program – the one part of the alleged conspiracy that the plaintiffs have consistently argued should be subject to the *per se* mode of analysis[9] – we

_____

[9] The plaintiffs never asked the District Court to determine whether the rule of reason or the *per se* standard applied to the other two components of the alleged conspiracy, namely: (i) the short-term supply-reducing recommendations, including early slaughter, early molting, and reduced hatch; and (ii) egg exports. The plaintiffs' argument has always been that the conspiracy was a single overarching conspiracy and that the *per se* standard applied to it as a whole. Once the District Court rejected that theory and determined that the rule of reason applied to the Certification Program, the plaintiffs never moved to have the Court consider whether the *per se* standard should apply to the other two alleged stratagems. Instead, the plaintiffs opted to try the case under the theory that

19

conclude that the District Court properly applied the rule of reason.

The Certification Program was not an express agreement to reduce the supply of eggs, much less to fix prices. And, notwithstanding the plaintiffs' protestations, it is not clear that the Program would "have manifestly anticompetitive effects and lack any redeeming virtue[,]" *id.* at 886 (citation omitted), as must be the case for the *per se* rule to apply. Although the Program required increased cage space and so would lead to fewer hens in existing structures, the Program did not limit the number of hens or structures a producer could have, so producers could increase the number of hen houses and add more hens. And Rose Acre provided evidence that hens with more cage space produce more eggs. Similarly, the impact on the supply of eggs of a prohibition on backfilling is less than clear, as there is evidence that the prohibition prevents disease and social competition and allows hens to live longer and produce more eggs.

Moreover, as the District Court said, "while the plaintiffs argue that the supply reducing effects of the conspiracy are essentially undisputable, the record includes evidence that egg supply actually *increased* during the conspiracy period." *Processed Egg Prods. II*, 206 F. Supp. 3d at 1047. Although the plaintiffs assert that the egg supply would have increased even more if not for the Certification Program, the economic impact of the actions at issue cannot be predicted with a high degree of certainty, which is a prerequisite for application of the *per se* standard. *See United*

there was one overarching conspiracy subject to rule of reason analysis.

20

*States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 670 (3d Cir. 1993) (citation omitted) ("*Per se* rules of illegality are judicial constructs, and are based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition[.]").

Despite that, the plaintiffs argue for that standard, relying heavily on the rule that horizontal agreements among competitors to fix prices are illegal *per se*. *Leegin*, 551 U.S. at 886. According to the plaintiffs, because they allege that the defendants engaged in a conspiracy to reduce the supply of eggs, the *per se* standard has to apply. But, as already indicated, the plaintiffs' choice of labels does not dictate the mode for assessing allegations and evidence. *Brown Univ.*, 5 F.3d at 670 ("[T]he test for determining what constitutes *per se* unlawful price-fixing is one of substance, not semantics."). The District Court thoroughly considered the plaintiffs' complaint and the record and determined that there was not a horizontal agreement to reduce supply and fix prices. The Court was confronted with practices having far less certain motives and far more complicated economic consequences, and that quite rightly led to application of the rule of reason. That choice was correct.

### C. The Rule 59 (e) Motion

The District Court also did not err in denying the plaintiffs' Rule 59(e) motion. Federal Rule of Civil Procedure 59(e) allows for "[a] motion to alter or amend the judgment." "[A] proper Rule 59(e) motion . . . must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Wiest v. Lynch*, 710

21

F.3d 121, 128 (3d Cir. 2013) (quotation marks omitted).  The plaintiffs do not claim that their motion is supported by a change in the law.  They do, however, argue that it is justified by new evidence and the need to correct a clear error of law and an injustice.

They say first that the jury's verdict constituted "new evidence" that effectively supersedes the District Court's prior determination that the rule of reason is the proper mode for analyzing the conspiracy.  As the plaintiffs see it, because the jury "found that there was, in fact, a single, overarching conspiracy to reduce supply," the verdict cannot be squared with application of the rule of reason and instead demands *per se* liability.  (J.A. 771.)  Accordingly, the plaintiffs argue, the District Court should have entered judgment in their favor and should not have let the jury consider whether the restraints on trade were reasonable.

To the extent the plaintiffs are arguing that the jury's verdict is somehow internally inconsistent, they lose.  They waived any such argument by failing to object to the verdict before the jury was discharged.  *See Frank C. Pollara Grp., LLC v. Ocean View Holding, LLC*, 784 F.3d 177, 191 (3d Cir. 2015) ("[I]f a party fails to object to an inconsistency in a general verdict before the jury is excused, that party waives any objection in that regard.").[10]  Moreover, the verdict is plainly not inconsistent when considered as a product of the rule of reason, which is the standard on which the jury was instructed.  The whole point of the rule of reason is to recognize that there are agreements that restrain trade but do not do so

---

[10] No argument has been made that the verdict form provided for a special verdict under Rule 49(a).

22

unreasonably.  That is the very conclusion the jury reached in this matter, after hearing five weeks of evidence and argument.

It should be obvious too that the jury's verdict does not constitute "new evidence."  It is not evidence of any sort.  A verdict is "[a] jury's finding or decision on the factual issues of a case."  *Verdict, Black's Law Dictionary* (11th ed. 2019).  Evidence, on the other hand, is "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact[.]"  *Evidence, Black's Law Dictionary* (11th ed. 2019).  A jury bases its verdict on evidence; it does not create evidence.  A verdict itself is thus not evidence at all, at least not in the self-same case.

The plaintiffs fare no better with their assertion that the District Court's decision to apply the rule of reason was a clear error of law and an injustice.  They repeat their focus on the Supreme Court's declaration that "[a] horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful[.]"  *Leegin*, 551 U.S. at 893.  But they skip over the words "in order to," which is a phrase with serious meaning.  When the aim of coordinated action is to set higher prices, the *per se* rule certainly does apply.  The plaintiffs, however, failed to prove that kind of intent or anticompetitive effect.  Again, the record both before and after trial paints a far more complex picture than the black and white caricature drawn by the plaintiffs' argument.  The District Court recognized that the rule of reason is the default standard and that *per se* liability is a rare exception, the latter being appropriate only when a court has "considerable experience"

23

with the type of restraint at issue and can predict that the restraint would be found to be unreasonable under the rule of reason in almost all instances. *Id.* at 886-87. In this case, that is simply not so. It cannot be said on this record that the complained-of practices are manifestly anticompetitive.

Indeed, the jury's finding that the restraints on competition at issue in this case were reasonable is a good indicator that the plaintiffs' demand for *per se* liability is off base. The *per se* rule presumes that a particular restraint is unlawful because the restraint is such as would almost always restrict competition unreasonably. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998). A jury is not asked to consider the reasonability of the restraint because the unreasonableness of it is so plain. One would think, then, that a restraint properly subject to the *per se* standard, if tried under the rule of reason, should ordinarily be found to be anticompetitive. But the jury here determined that the complained of practices were actually reasonable, rather than an effort to drive up prices. That it also found the defendants had some agreement to reduce supply does not mean, either as a matter of logic or law, that the District Court erred in saying that the rule of reason was the proper mode of analysis.

The plaintiffs' Rule 59(e) motion is really just a recasting of their argument that any brake on expanded supply is illegal *per se*. They proposed a verdict form requiring the jury to determine whether Rose Acre participated in a conspiracy to reduce the supply of eggs and, if so, whether that "conspiracy unreasonably restrained trade." (J.A. 756.) But, throughout this litigation, they have never wanted an answer to that second question. Their position has always been that the answer to the first question is alone dispositive. As already

24

discussed, however, that is not the law, and the plaintiffs are not entitled to undo the jury's verdict simply because they would rather have liability presumed than proven. The District Court did not abuse its discretion in denying their motion to alter or amend the judgment.

## III.    CONCLUSION

The District Court did an admirable job in addressing the myriad legal issues presented in this complex case and in presiding at trial. The plaintiffs' last-ditch effort to overturn their loss is unsupportable. For the reasons stated, we will affirm.